UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

\---------------------------------------------------------------X

GRANGE CONSULTING GROUP            :
and PAUL PARMAR,

                                   :

                    Plaintiffs,              **VERIFIED**
                                   :         **COMPLAINT**

        -against-                  :

                                             **Civil Action No.**
DAVID BERGSTEIN, PINEBOARD
HOLDINGS, INC., ROBERT B. SILVERMAN,  :
ALBERT HALLAC, JEFFREY HALLAC,
LAWRENCE TWERSKY, WESTON           :
CAPITAL MANAGEMENT LLC,
SOVRIN HEALTH SYSTEMS, INC.,       :
ALEX M. WEINGARTEN and
WEINGARTEN BROWN LLP               :

                    Defendants.    :

\---------------------------------------------------------------X

        Plaintiffs Grange Consulting Group ("Grange") and Paul Parmar ("Parmar"), by

way of this Verified Complaint against Defendants ("Defendants"), state as follows:

## INTRODUCTION

        1.      Parmar is a successful, self-made business man who immigrated to this

country 20 years ago and, with no resources of his own, landed a job at a major US bank.

During the past 13 years, he has owned, acquired, operated and exited several successful

enterprises, relying on his own business acumen and personal financial diligence in dealing with

a variety of commercial counterparties and opportunities.  Parmar met David Bergstein

("Bergstein") in September of 2006 when Bergstein was in search of longer-term funding to

replace his $10 million bridge loan for the movie "Before the Devil Knows You're Dead"

("BDKYD").  Bergstein presented what appeared to be an attractive financial opportunity based

on a modest amount of risk.  Based on estimates of, and actual contracts for, so-called "pre-

sales" (the selling off of foreign distribution rights to a motion picture prior to its completion and release in the U.S.), Bergstein claimed that Parmar would be fully repaid on or before the day on which the film first appeared in theaters in the U.S., including all fees and interest, and irrespective of the film's performance at the U.S. box office.

2.      Shortly after Parmar funded BDKYD, Bergstein introduced Parmar to Ronald N. Tutor ("Tutor"), with whom he co-owned and co-managed several companies that encompassed their joint interests in the movie business.  Rather than admit that Bergstein and Tutor were longtime partners, Bergstein hailed Tutor as a third party billionaire investor who only recently, on his own, had decided to invest in Bergstein-led opportunities in the movie business.  At the time, Tutor supported and gave credence to what later turned out to be deliberately false and misleading representations made by Bergstein regarding Bergstein's track record, trustworthiness and ability to execute.  By early 2007, Bergstein had established a strong personal relationship with Parmar through numerous meetings, conversations and joint travel. Throughout the latter half of 2006 and the beginning of 2007, as Bergstein and Tutor continued reeling Parmar in with lending and investing opportunities built on false representations (made to look credible by Tutor's "involvement"), Parmar became convinced he had found new business partners and friends with whom he shared the risks and rewards of an exciting new area of business.  During this time, Parmar provided millions of dollars to Bergstein and/or companies controlled by him and/or Tutor for the purpose of producing films, acquiring "film libraries" or to be used as working capital for the entities Bergstein and Tutor co-owned and co-managed, including R2D2, LLC and CT-1 Holdings, LLC and their affiliates.  After Bergstein lured Parmar into funding several one-off projects and deals, he set his sights a bit higher, asking Parmar to become "an equal partner" with Bergstein and Tutor in all of their movie-related

business ventures.  The initial asking price was $7-$10 million, but when Parmar was prepared to invest that amount, Bergstein quickly changed the requirement to $17 million for the same "equal share".

3.       Over the course of 2006 and into 2008, Parmar had made over seven separate loans to companies managed or controlled by Bergstein and/or Tutor, for a total of $65 million.  By early 2008, the amount owed to Parmar had ballooned to over $80 million and most of the loans were in or near default.  Not surprisingly, the relationship began to sour.  Each time Bergstein had promised a partial payment or repayment for a loan or investment made by Parmar by a particular date, that date had come and gone with no money received by Parmar.  The continuing lack of cash flow back to Parmar created severe liquidity problems for Parmar, causing him to forfeit equity positions in investments, lose control of a GE aircraft leasing business, and suffer defaults on houses he owned in Florida and Texas.  As Bergstein failed to make good on any of his promised repayments to Parmar, Parmar's financial situation worsened. Finally, in or around the end of 2008, Bergstein approached Parmar with a new proposal: if Parmar agreed to accept $24 million instead of the approximately $85 million he was owed, Bergstein would create a "payment plan" to get Parmar the $24 million over 18 months.

4.       It is relevant to the allegations herein to understand that Bergstein and Tutor's motion picture interests, grouped under the umbrella of their jointly-owned holding company "R2D2, LLC" (which name is pun shorthand for "Ron and David"), were teetering on the edge of insolvency.  By late 2009, this situation was so critical that Bergstein was contemplating putting the companies into voluntary liquidation.  As he wrote to another investor, Doug Martin of Stephens Investments: "We continue to defend lawsuits pending against most of the entities under CT-1. There are approximately 35 litigations from varies [sic] creditors and

come [sic] have gone to judgment.  Most of the claims are valid (around 80%)…."  Later in that same email, Bergstein writes "If there is no resolution with DBZ (ie DBZwirn, Bergstein and Tutor's principal lender) by the end of March, we will likely take steps to put the existing entities into some sort of liquidation."

     5.     Defendant Bergstein has operated through numerous different entities under his control, many of which were owned by CT-1 Holdings, LLC ("CT-1"), which was in turn owned by R2D2, LLC ("R2D2").  Involuntary bankruptcy petitions were filed against R2D2, CT-1 and three of their affiliates on March 17, 2010, by a group of over 20 petitioning creditors and an emergency trustee was simultaneously appointed over all five debtors.  In a three hundred and seventy-four (374) page "Report of Investigation" issued approximately one year later (the "Trustee's Report"), the Trustee made numerous findings consistent with the deception and other tactics practiced by Bergstein in luring Parmar's investment.  The Trustee's Report includes findings, *inter alia*, that: i) as manager of one of the debtors, Bergstein had commingled and diverted the proceeds of loans made to, signed by and/or guaranteed by various debtors and that Bergstein used various bank accounts to commingle and divert the proceeds of those loans including the diversion of more than $1 million to Las Vegas casinos for the credit of Bergstein as a player; ii) that Bergstein had attempted to retroactively rearrange the organizational chart of his companies to make it appear that there was not interlocking ownership of the debtors and therefore he would not be an insider of the debtors; iii) that thousands of computer files had been improperly deleted by Bergstein's companies just before and just after the involuntary bankruptcy cases were filed; iv) that Bergstein prepared back-dated documents to make it appear that assets of the debtors had been transferred prior to the entry of various judgments and the entry of a restraining order; v) that substantially all of the assets of the

bankrupt debtors had been transferred pre-petition to a non-debtor affiliate and that a non-debtor affiliate of Bergstein had acquired and/or held liens in excess of $40 million against those assets; and vi) that portions of spreadsheets of the debtors were improperly withheld in an unjustified, dilatory and costly effort by Bergstein to delay the Trustee's recovery of information concerning the debtors' sources and uses of funds.

6.      Like the many creditors in the involuntary bankruptcy of R2D2 and its affiliates, Parmar was one of Bergstein's victims.

7.      In 2011, Bergstein and the other individual defendants created or helped create Defendant Pineboard Holdings, Inc. ("Pineboard") to orchestrate the fraudulent solutions to three problems.  First, Pineboard would acquire a medical billing business by the name of MdTablet ("MDT") from Parmar and thereby hopefully quiet disgruntled investors in Wimbledon Financing Master Fund ("Wimbledon"), a fund they in turn controlled through their control of its manager, Weston Capital Management LLC ("Weston").  Second, because Bergstein knew that Parmar was then in financial straits, Bergstein could condition payment of monies due to Parmar with respect to the purchase of MDT on Parmar signing a release agreement whereby Parmar waived any claim to over $80 million that Bergstein and his entities owed Parmar for monies that Parmar had loaned to Bergstein controlled ventures including successful motion pictures.  Defendants Alex M. Weingarten and Weingarten Brown LLP, an attorney and his law firm representing Bergstein and his companies, unlawfully aided and abetted the fraud perpetrated against Parmar.  Third, the acquisition of MDT would provide the opportunity to seize computer servers owned by Grange and Parmar that were located in premises shared by MDT, Grange and Parmar ("Grange/Parmar Servers").  Bergstein wanted to seize possession of the Grange/Parmar Servers because he believed that they would contain

recordings of telephone conversations and meetings that he had with Parmar in which Bergstein revealed notorious schemes.

8.      Perpetrating that scheme, Pineboard was formed, contracts were executed for the purchase of MDT's assets, Parmar was forced to sign the release agreement in April 2012 to obtain a payment due for the purchase of MDT, and the Grange/Parmar Servers were stolen in May 2012 and transported to Defendant Sovrin Health Systems, Inc. in California.

9.      Accordingly, Parmar seeks compensatory and punitive damages against Bergstein for fraud in the inducement, compensatory damages against Weingarten and Weingarten Brown LLP for aiding and abetting fraud; compensatory damages against Bergstein for economic duress, compensatory damages against Robert B. Silverman, Albert Hallac, Jeffrey Hallac and Lawrence Twersky for aiding and abetting economic duress, and Grange and Parmar seek compensatory and punitive damages, and attorneys' fees and costs, and injunctive relief against all defendants for misappropriation of trade secrets, and Grange seeks damages against Bergstein, Robert B. Silverman and Lawrence Twersky for tortious interference with contract.

## JURISDICTION AND VENUE

10.      Jurisdiction in this Court is proper based on the diversity of citizenship between the parties and the amount in dispute exceeding $75,000.

11.      Venue is proper in that: (a) the more than $85 million loaned by Parmar with Bergstein was loaned principally for motion pictures produced or to be produced in New Jersey; (b) Bergstein met with Parmar in New Jersey on numerous occasions to request and receive the loans; and (c) the Grange Servers were located in the State of New Jersey, stolen in the state of New Jersey and their return is sought to the State of New Jersey.

## PARTIES

12.     Plaintiff Grange is a citizen of the State of New Jersey and is a corporation organized and existing pursuant to the laws of the State of New Jersey with its principal place of business located at 2 Tower Center Boulevard, Suite 2001, East Brunswick, New Jersey 08816.

13.     Plaintiff Parmar is a citizen of the State of New Jersey residing at 19 Colts Gait Lane, Colts Neck, County of Monmouth, State of New Jersey.

14.     Defendant Bergstein resides in the State of California and is a citizen of the State of California.

15.     Defendant Pineboard Holdings, Inc., ("Pineboard") is, upon information and belief, a corporation organized and existing pursuant to the laws of the State of Delaware and maintains its principal place of business in the State of California and is a citizen of the State of California.

16.     Defendant Robert B. Silverman ("Silverman") is, upon information and belief, a citizen of the State of California residing at 25 South Oak Knoll Avenue, Ste. 504, Pasadena, California 91101.

17.     Defendant Albert Hallac ("A. Hallac") is, upon information and belief, a citizen of the State of New York with a principal place of business located at 767 Third Avenue, 25th Floor, New York, NY 10017.

18.     Defendant Jeffrey Hallac ("J. Hallac") is, upon information and belief, a citizen of the State of Connecticut with a principal place of business located at 767 Third Avenue, 25th Floor, New York, NY 10017.

19.     Defendant Lawrence Twersky ("Twersky") is, upon information and belief, a citizen of the State of California residing at 4637 El Cabellero Drive, Los Angeles, California 91356.

20.     Defendant Weston Capital Management, LLC ("Weston") is, upon information and belief, a limited liability company organized and existing pursuant to the laws of the State of New York with a principal place of business located at 767 Third Avenue, 25th Floor New York, NY 10017.

21.     Defendant Sovrin Health Systems, Inc. ("Sovrin") is, upon information and belief, a corporation organized and existing pursuant to the laws of the State of California and is a citizen of the State of California with its principal place of business located at 550 N. Brand Boulevard, Suite 1800, Glendale, California 91203.  Defendant Twersky is Chief Operations Officer of Sovrin.

22.     Defendant Weingarten is, upon information and belief, an attorney admitted to practice in the courts of the State of California, with a principal place of business located at Weingarten Brown LLP, 10866 Wilshire Boulevard, Suite 500, Los Angeles, California 90024-4340, and a citizen of the State of California residing in the State of California.

23.     Defendant Weingarten Brown LLP ("Weingarten Law Firm") is, upon information and belief, a limited liability partnership law firm organized and existing pursuant to the laws of the State of California with its principal place of business located at 10866 Wilshire Boulevard, Suite 500, Los Angeles, California 90024-4340, and is a citizen of the State of California.

## FACTS

**A.     The Nature Of Bergstein's Business Affairs**

24.     The Trustee Report found that beginning in 2002, Bergstein utilized one of his entities to commingle and divert the proceeds of loans made to, signed by, and/or guaranteed by various entities that ultimately became bankrupt debtors.

25.     The Trustee Report found that Bergstein used bank accounts to commingle and divert the proceeds of those loans, including the diversion of more than $1 million to Las Vegas casinos for the credit of Bergstein as a player.

26.     The Trustee Report found that Bergstein attempted to retroactively rearrange the organizational chart of his entities to make it appear that a key subsidiary was a stand-alone entity (which it was not).

27.     The Trustee Report found that approximately 1,499 files were deleted from a computer server in the office occupied by Bergstein and his affiliates on March 16, 2010, one day before the involuntary bankruptcy cases were commenced against several of Bergstein's entities.  Another 1,479 files were deleted after the involuntary bankruptcy filings, including approximately 1,438 deleted on March 30, 2010.

28.     The Trustee Report found that, on April 13, 2010, Bergstein disclosed that substantially all of the assets of the debtors had been transferred pre-petition to a non-debtor affiliate and that a non-debtor affiliate of Bergstein had acquired and/or held liens in excess of $40 million against those assets.

29.     The Trustee Report concluded that Bergstein and Ronald N. Tutor ("Tutor"), with whom he co-owned and co-managed the debtors, had fabricated and/or backdated

a document pursuant to which Tutor purported to have sold his interests in the debtors to Bergstein, 13 months prior to the filling of the involuntary petitions.

30.     The Trustee Report found that portions of spreadsheets of the debtors were improperly withheld in an unjustified, dilatory and costly effort by Bergstein to delay the Trustee's recovery of information concerning the debtors' sources and uses of funds, and that the spreadsheets may have been altered prior to their production to the Trustee.

31.     The Trustee Report concluded that the creditors of the debtors would likely recover nothing from the bankrupt estates absent orders: (a) substantially consolidating the debtors and their affiliates; (b) equitably subordinating the claims of all debtors' insiders including Bergstein; and (c) authorizing the Trustee to access and image all withheld computers of Bergstein and two other individuals.

**B.      Parmar's Victimization By Bergstein's Conduct Which Was
         Embellished By The Imprimatur Afforded By Bergstein's Cohorts**

32.     Parmar is a successful, self-made business man who arrived in the United States twenty years ago with no assets to his name.  Over the course of thirteen years, he built and operated successful investment companies through his own diligence and acumen.

33.     Parmar first met Bergstein in 2006.  Bergstein was looking for a loan to replace a short-term $10 million bridge loan that he had obtained to produce the film "Before The Devil Knows Your Dead".  Bergstein presented Parmar with a very conservative invitation to participate in a great business opportunity.  Bergstein presented Parmar with pre-sales and estimates of further sales that exceeded the total budget for the movie and provided for the full repayment of Parmar's loan with interest regardless of the box office performance of the movie.

34.     Parmar agreed to make the loan after Bergstein presented detailed due diligence on the pre-sales and estimated sales figures stating that the loan would be repaid in full

with interest and fees in less than nine months.  Upon closing that $10 million loan from Parmar, Bergstein started a relationship with Parmar concerning what were presented as a rapidly increasing set of great loan opportunities.

35.     Bergstein is a very intelligent, charismatic person and a smooth talker that can make others trust him very quickly.  Bergstein introduced Parmar to Tutor who was represented to Parmar by Bergstein as being a very strict and conservative billionaire, who loved the financial opportunities presented by Bergstein.  Parmar was told that Tutor had his entire team of accountants and attorneys perform thorough due diligence on Bergstein before Tutor became an equal partner in Bergstein's motion picture businesses.

36.     Bergstein then started floating the idea of Parmar becoming an equal participant alongside him and Tutor, rather than continuing to finance individual movies on a one-off basis.  Bergstein traveled to New Jersey on numerous occasions beginning in late 2006 to meet with Parmar and discuss financing opportunities.  Bergstein and Parmar also took a trip together to London to visit some of the businesses in which Bergstein was involved, including Capitol Films Limited (which Bergstein separately caused to be put into administration, a form of insolvency under UK law, in February of 2010).

37.     Initially, Bergstein told Parmar that the total funding provided by Bergstein and Tutor to produce and distribute certain motion pictures (and/or acquire certain distribution rights to other motion pictures) was approximately $17 million, and Bergstein wanted Parmar to make a senior loan of approximately $7 million to $10 million to roughly equalize the three lenders.  Bergstein said that loaning that amount would also provide Parmar with warrants entitling him to 33% ownership of various corporate entities that Bergstein and Tutor controlled and those warrants could be exercised upon repayment of the loans, interest and

fees.  Bergstein had several meetings with Parmar in New Jersey during which Parmar was lulled into feeling very comfortable with the idea of substantially increasing his funding in order to take advantage of what appeared to be an attractive offer.

38.     As Bergstein saw that Parmar was ready to increase his lending, Bergstein suddenly started claiming that he and Tutor had provided $33 million in funding, instead of $17 million.  That doubling of the supposed initial funding, he argued, meant that Parmar would have to double his contribution in order to receive an equal 1/3 share.

39.     That sudden, dramatic increase in the amount led to understandably heated debates between Parmar and Bergstein as to the terms that had been previously proposed and discussed.  To avoid such controversies in the future, especially where such large sums of money were concerned, Parmar told Bergstein that Parmar would begin recording their conversations so that there could be no issue as to what had been discussed and agreed upon.  Bergstein, who maintained that he had not reneged on the original deal, still sought Parmar's investment and consented to Parmar recording their discussions going forward, even going so far as to say he "welcomed" Parmar doing so.  Accordingly, Parmar thereafter recorded each conversation with Bergstein.

40.     In late 2006 and early 2007, Bergstein enticed Parmar to make other additional loans, including but not limited to: a $9 million loan for "Black Water Transit", a $2.5 million loan for "Fade Out", a $3 million loan for the acquisition of "De Lane Lea" (a post-production facility in London), a $7.5 million loan for working capital, a $5 million loan for the acquisition of "Sheridan Square" (a UK-based music company), a $4.5 million loan for the acquisition of a collection of motion picture distribution rights known as the "Intermedia Library", and a $2.75 million loan for the production of the movie "Love Ranch".

41.    By means of the foregoing, between 2006 and 2008, Parmar loaned Bergstein over $65 million in total.

42.    Pursuant to the contracts, most of the funding provided by Parmar was to be repaid by late 2007 or early 2008, based on explicitly stated maturities or repayment dates. As those repayments began to fall due, Bergstein started refusing to take Parmar's calls. In short, Bergstein did to Parmar what Plaintiffs intend to show at trial that he typically does to investors and lenders in these circumstances, ie Bergstrein "went dark".

43.    Ever since Bergstein was in default on most of the loans, his pattern of responding to Parmar's calls and emails was that Parmar would place hundreds of phone calls, hundreds of text messages and emails, and then Bergstein would, after between ten and forty days, finally take a call from Parmar. Then Bergstein would tell a sob story about people not paying him, his being attacked by persons calling him for payments, and having more than fifty lawsuits to handle with depositions and judgment debtor exams on a daily basis. The Bergstein would angrily castigate Parmar with thousands of phone calls and would promise to start making some small payments on some regular basis, and keep in touch with Parmar on a daily basis.

44.    By the end of 2007, the total due from Bergstein to Parmar, with interest and fees, had risen to more than $65 million.

## C.    Bergstein Used Parmar's Distressed Financial Situation To Fraudulently Reduce The Amount Owed To Parmar

45.    In late 2007, Bergstein told Parmar that he had located a new capital source identified only as a person named "Simon" that would be willing to provide funding, but only if Bergstein was able to "restructure" the repayment of Parmar's loans. By "restructure" what Bergstein really meant was that Parmar would reduce what was at that point over $80 million owed to a fixed amount of $24 million. If Parmar was willing to do that, then Bergstein

claimed he would be able to obtain funding from Simon to pay Parmar $3 million immediately, followed by an additional payment of $3 million within ninety (90) days thereafter, and a further payment plan for the balance to be paid over eighteen (18) months on terms and more precise conditions "to be negotiated."

46.     Bergstein presented Parmar with a Hobson's choice: either accept a reduction in amounts owing (based on the premise that "Simon" would accept no other terms) or Bergstein would be forced to file for bankruptcy (in which case Parmar might see very little or nothing).

47.     Bergstein made the demand for a reduction in the amount owed to Parmar at a time when Parmar needed funding to meet a capital call in an unrelated investment Parmar had made.  Failure to meet that capital call would permit the selling partners to claw back Parmar's acquisition agreement at a substantial loss to Parmar.  Bergstein, who knew these details because Parmar had told him about the situation, exploited them to his own advantage.

48.     Bergstein's representations to Parmar at the time were false.  No "Simon" existed with a bona fide offer to pay Parmar $24mm over 21 months.  Bergstein deliberately deceived Parmar that Simon existed, in order to cut down his obligations.  Given the pressures on Parmar of which Bergstein was aware, Bergstein knew Parmar would have no choice but to accept the deal (which he reluctantly did, under duress and based on the false representations). .

49.     As it turns out, Bergstein made none of the payments that he had promised as the inducement for Parmar to agree to reduce the total outstanding from over $80 million to $24 million: not the $3 million down, not the $3million within 90 days, and not what would have been the remaining $18 million.

14

50.    Bergstein's failure to make those payments caused Parmar to default with respect to his obligation to meet a capital call in another investment.  That default caused Parmar's interest in the investment to be reduced from 85% to 44%, at which point he lost majority control (including the right to direct and/or control acquisitions).  Parmar's damages from the failure to meet that capital call, which will be proven at trial together with the relevant details of this investment, are in excess of $15 million.

51.    In 2008, Bergstein proposed another restructuring of the debt owed to Parmar.  Although Bergstein had completely defaulted in making the payments that had been the inducement for Parmar to reduce the total amount owed to him from over $80 million to $24 million, Bergstein now proposed a further "restructuring" pursuant to which he suggested that Parmar accept $18 million (rather than the previous haircut, which would have purported to leave him with $24 million).  This time, Bergstein promised that he would pay Parmar $12 million within six months and another $6 million over the subsequent eighteen months.  Bergstein timed this new offer to coincide with escalating capital calls upon and financial commitments of Parmar – all of which Bergstein had gained knowledge of while he was cozying up to Parmar and taking his money.  Parmar was in default on payments for aircraft and houses in Florida, New Jersey, Switzerland and Texas in which he had over $5 million in equity.  Parmar was in desperate need of cash flow, and Bergstein utilized that fact to compel Parmar to accept an unconscionable reduction in the amounts he was owed.  If Parmar agreed to the reduced debt, Bergstein further promised that he would use his own contacts to assist Parmar in negotiating a solution to the various debts and obligations of Parmar which had in the meantime matured and/or begun to proceed into foreclosure.

52.     After forcing Parmar to agree to the reduction in Bergstein's indebtedness from $24 million to $18 million, Bergstein again made no payments.  Only after a series of hostile and heated phone calls demanding payment, did Bergstein make a single $500,000 payment, approximately thirty days after Parmar's agreement to the reduction in overall indebtedness to $18 million.

53.     Bergstein's failure to repay even the dramatically and fraudulently reduced loan amount caused foreclosure on three jets resulting in a loss to Parmar of at least $18 million in equity, and losses to Parmar of at least $40 million for other defaulted contract amounts.

54.     Bergstein's failure to make any further payment against the $18 million amount also precluded Parmar from meeting capital calls which resulted in Parmar's ownership in a profitable cancer treatment center being reduced from approximately 45% to less than 5%.

**D.      Bergstein Proposes To Fully Repay Parmar
Through The Funding Of MDT**

55.     In approximately mid 2010, Bergstein approached Parmar again, this time proposing that he could make Parmar whole for the entire $85 million, by obtaining third party investor funds to capitalize MDT, a successful business that Parmar had created and managed.

56.     In 2008 and 2009, Parmar had created MDT as a service for physicians. The purpose of MDT was to provide a computerized, centralized compendium of information concerning a patient.  The average patient would suffer from several different conditions and would see different physicians for the different conditions.  The treatment that would be excellent for one condition could be extremely detrimental as to another condition affecting the patient.  Successful implementation of MDT would be extremely helpful to physicians and extremely beneficial to patients.  If a sufficient number of physicians subscribed to MDT, it

could be a very profitable service. Enticing physicians to subscribe to MDT required a successful pilot program. Such a program also required a substantial initial investment.

57. Parmar had invested over $50 million in equity to create MDT and had signed up over 2,000 participating physicians. Bergstein was well aware of Parmar's dire need for additional funding to support the MDT pilot program. Bergstein took advantage of that dire need to cause Parmar to agree to further reductions in the amount that he was owed based on what turned out to be, yet again, fraudulent promises of Bergstein delivering funding for the MDT pilot program.

58. Having previously caused Parmar to agree to reduce the indebtedness from over $80 million to $24 million based on fraudulent promises, Bergstein this time caused Parmar to agree to a further reduction to $12 million. Bergstein falsely represented that the $12 million would be paid in two installments of $6 million each over a twelve month period.

59. In 2009, Bergstein occasionally proposed a variation on the theme that Parmar should simply accept less money than he was owed. As pressure mounted on MDT to secure funding in order to continue growing its operations, Bergstein occasionally dangled the alternative of procuring relatively small amounts of investment into MDT, in exchange for Parmar forgiving all amounts due by Bergstein. In the first such instance, Bergstein proposed to arrange for a $2.5 million investment into MDT by Dennis Pelino ("Pelino"), a business associate of Bergstein. From late 2009 through early 2010, Parmar repeatedly chased Bergstein as to obtaining the Pelino funding, but nothing transpired other than a few versions of a term sheet proposed by Bergstein.[1]

---

[1] In May of 2011, Pelino was indicted by a grand jury and charged with engaging in a conspiracy to defraud the United States Securities and Exchange Commission (SEC), investors and others and to enrich themselves through a series of undisclosed and disguised related party transactions and insider trading that generated proceeds in excess of

60.     Again, in early 2010, Bergstein claimed that he could secure a similar investment for MDT from Gerova Financial Group.  Again, Parmar chased Bergstein to obtain the funding that he proposed, but Bergstein did not follow through and no transaction with Gerova ever took place.

**E.     Bergstein Proposes That Pineboard Acquires MDT**

61.     Finally, sensing an opportunity to kill several birds with one stone, Bergstein proposed combining the health care assets controlled by Parmar, including MDT, with hedge fund assets controlled by Weston into a new vehicle.  That new vehicle was eventually formed and is the Defendant Pineboard.

62.     Parmar had made Bergstein aware of the facts that MDT had many unpaid vendors and MDT employees had resigned for non-payment of salaries and/or benefits, and that Parmar had borrowed significant funds from his relatives and close friends in an effort to sustain MDT.

63.     Against that backdrop, Bergstein made yet another proposal to make Parmar "whole", as follows:  Pineboard would initially acquire MDT, but would ultimately share ownership such that Pineboard owned 37%, Parmar owned 38%, Bergstein owned 21% and the remaining 4% was owned by Wimbledon Real Estate Financing Fund (a fund related to Wimbledon controlled by Bergstein and Weston) owned approximately 4% being owned by Wimbledon Real Estate Financing Fund (a fund related to Wimbledon and also managed by Bergstein).

64.     This appeared to have a rationale for each constituency.  Investors in Wimbledon, who had been told by Weston and Bergstein that their shares were nearly worthless,

---

$50 million in connection with a company called Xinhua Finance.  Pelino was found guilty in 2013 and is currently serving time in a federal penitentiary in Florida.

would acquire 41% of a promising new business (between the holdings of both Wimbledon and Wimbledon Real Estate Fund).

65.     Parmar would ostensibly retain the single largest stake in a company that would be better financed and better able to pursue an expansion strategy.  Unbeknownst to Parmar at the time, however, Bergstein would collude with Weston to control Pineboard through his and Wimbledon's ownership of Pineboard (amounting to a combined 58% control).

66.     A purchase and sale agreement, dated August 17, 2011, was executed pursuant to which Pineboard acquired the assets of MDT and some other related assets for total consideration of $4.75 million, to be paid in cash in six installments and a commitment to source or otherwise make available not less than $35 million in additional capital to pursue further acquisitions in the sector.

67.     Parmar was thus led to believe that, although he was giving up some ownership, he would be gaining cash to meet his personal needs, would retain control over MDT's assets even after the acquisition of those assets by Pineboard, and Pineboard would be funded for expansion.  Had these promises been kept, the rationale for each party appeared to have merit.

1.     **Bergstein Plunders Pineboard's Assets**

68.     Very quickly, however, it became clear that Bergstein did not intend to make good on the promises, but instead to default on them, cause further distress and extract further concessions from Parmar, consistent with his past practices.

69.     After the purchase and sale agreement was executed, Bergstein immediately began exercising control over Pineboard in concert with Weston.  He diverted Pineboard's assets to pay third party consultants for services rendered on non-Pineboard business

(ie. to pay them for past services rendered to Bergstein that were unpaid), and to make gratuitous payments to himself and others.

70.     Extreme conflicts developed between Parmar and Bergstein during this period and are captured in numerous emails and texts from the period that have been preserved.

71.     When Parmar protested the plundering of Pineboard's assets, Bergstein and Hallac reneged on their obligations to fund the future scheduled payments under the Pineboard purchase agreement and to provide the promised financing for the rollup strategy.

72.     Bergstein was acutely aware of the fact that Parmar was in urgent need of cash at the time that the next installment under the Pineboard purchase agreement was due to Parmar.

73.     As an example of how aware Bergstein was, he used Parmar's crisis to take further monetary advantage of him. Bergstein suggested that Parmar give Bergstein over one dozen fine watches belonging to Parmar, having an aggregate value of not less than $200,000, so that Bergstein could sell them for Parmar's benefit on a website that Bergstein controlled, called "BIDZ.com".  Parmar gave the watches to Bergstein for sale, but never received any proceeds from the sale of the watches.

## 2.    Bergstein Conditions Payment Due To Parmar On Parmar Forgiving Debt

74.     As the conflict over the outstanding payments due from Pineboard to Parmar for the sale and purchase of MDT reached a fever pitch, Bergstein moved in for the kill. He promised to release the final payment – money for which Parmar was obviously desperate at this point – only on the condition that Parmar sign an all-encompassing release, cleansing Bergstein of any liability whatsoever for the $85 million owed to Parmar on account of the various loans, payments and accruals over the years.

75.     Facing financial ruin and otherwise under extreme duress, Parmar signed the release agreement in favor of Bergstein and various entities under his control.

76.     In April, 2012, two days after signing the fraudulent release, Parmar received the $2.2 million payment that had been due under the Pineboard Purchase Agreement.

77.     There was, however, still one more bird to kill.

78.     The Pineboard purchase agreement provided for the sale of the properties and assets of MDT to Pineboard.

3.     **Bergstein Uses The MDT Purchase To Steal Other Computer Servers Containing Recordings Of Conversations In Which He Admits Unlawful Conduct**

79.     In September 2011, Parmar, on behalf of MDT, provided Pineboard with ownership documents for MDT's $4 million of equipment, including the MDT Servers ("MDT Ownership Documents"). The MDT Ownership Documents specifically distinguished between the MDT Servers subject to the Pineboard purchase agreement and the Grange/Parmar Servers that were not subject to the purchase agreement.

80.     In January, 2012, another copy of the MDT Ownership Documents was provided by Parmar to Hallac at a meeting in Florida.

81.     To resolve certain disputes that arose with respect to the purchase agreement, a further agreement, dated March 16, 2012 (the "Resolution Agreement"), was executed by Pegasus (an entity controlled by Bergstein), Pineboard, MDT, General Health Technologies, LLC ("GHT") and Parmar.

82.     Pursuant to the terms of the purchase agreement and the Resolution Agreement, Pineboard was entitled to remove the equipment identified in the MDT Ownership Documents ("MDT Equipment"), including the MDT Servers, from offices located at Suite

2001, 2 Tower Center Boulevard, East Brunswick, New Jersey 08816 ("East Brunswick Offices").

83.     The East Brunswick Offices were occupied not only by MDT but also by Grange and Parmar. Despite the fact that they shared offices, the Grange/Parmar servers were <u>not</u> sold to Pineboard; only the MDT servers were.

84.     On the morning of May 3, 2012, Parmar discovered that he could not access his email.

85.     Upon inquiry, Parmar learned that Pineboard had removed not only the MDT Equipment including the MDT Servers from the East Brunswick Offices but had also removed the Grange/Parmar Servers.

86.     As stated above, the Grange/Parmar Servers were never the property of MDT.

87.     The files on the Grange/Parmar Servers contained confidential, proprietary and personal information of Grange and/or Parmar.

88.     Pineboard never had any legal right whatsoever to take possession of the Grange/Parmar Servers, but they did.

89.     Upon information and belief, Defendants Silverman and Twersky traveled from California to New Jersey to oversee the theft of the Grange/Parmar Servers.

90.     Upon information and belief, Silverman and Twersky were assisted in the theft of the Grange/Parmar Servers by an information technology specialist sent by Defendant Weston Capital Management LLC ("Weston") and by Defendant Albert Hallac, Weston's chairman.

**F.      To Accomplish The Theft Of The Grange/Parmar Servers,**
         **Bergstein's Employees Terrorize an Immigrant GHT Employee**

91.      Grishma Gangar ("Gangar") was an employee of GHT.

92.      Gangar had knowledge with respect to the log-in information and passwords for the computer equipment located at the East Brunswick Offices including MDT equipment and the Grange/Parmar Servers.

93.      Gangar told Parmar that she had been repeatedly, relentlessly and recklessly threatened and intimidated by Silverman and Twersky in the course of forcing her to reveal the log-in information and passwords for the computer equipment located at the East Brunswick Offices including MDT equipment and Grange/Parmar Servers.

94.      Gangar told Parmar that Silverman and Twersky had told her that they had been her employers since October 2011.

95.      Gangar told Parmar that Silverman and Twersky had threatened to fire her, report her to immigration, take away all of her rights and sue her for damages if she did not fully cooperate with their removal of the Grange/Parmar Servers and if she did not fully reveal all log-in information and passwords for the Grange/Parmar Servers.

96.      Gangar told Parmar that on May 3, 2012, the day that Parmar discovered the theft of the Grange/Parmar Servers, Silverman directed her to falsely inform MDT that she was sick and would not be in the office that day because she was going to see a doctor.  Gangar did send an email stating that she was ill when she in fact was meeting with Silverman, Twersky and the information specialist.

97.      On or about May 4, 2012, Parmar spoke by telephone with Hallac concerning the improper removal of the Grange/Parmar Servers.

98.     Hallac stated to Parmar that he did not know anything concerning the whereabouts of the Grange/Parmar Servers, and implored Parmar "please don't call the police" and "don't do anything."

99.     Hallac further promised that Silverman would return the Grange/Parmar Servers.

100.    In a later call, Hallac again asked that Parmar not make the Grange/Parmar Servers a law enforcement issue and assured Parmar that he would personally see to the return of the equipment forthwith.

101.    Despite repeated demands by Grange and Parmar for return of the Grange/Parmar Servers, the Grange/Parmar Servers were not returned and repeated commitments by Hallac, Silverman and Pineboard to return the Grange/Parmar Servers were never honored.

**G.      Bergstein Coerces Parmar Into Dismissing An Action Challenging
The Theft Of The Grange/Parmar Servers, And Then Successfully
<u>Claims Attorneys' Fees Against Parmar For Filing A Frivolous Case</u>**

102.    On or about May 30, 2012, Parmar commenced an action in the Superior Court of New Jersey, Chancery Division, Monmouth County, seeking recovery of the stolen Grange/Parmar Servers ("New Jersey Action").

103.    The New Jersey Action was initially commenced against an employee, Grishma Gangar, who had knowledge of, and involvement in, the theft of the Grange/Parmar Servers.

104.    Gangar advised Parmar that the Grange/Parmar Servers had been transported to and were located at Sovrin in Glendale, California, which is named as a defendant in this action.  Bergstein formed Sovrin in or about the Spring of 2012.  Twersky is Chief

Operations Officer of Sovrin. Upon information and belief, the Grange/Parmar Servers today remain at Sovrin and/or under the control of Bergstein.

105. Thereafter, as further facts became known, the New Jersey Action also named as defendants Pineboard, Silverman, A. Hallac, Weston, Anytime Business Consulting, Edwin Martinez, Sovrin and Twersky.

106. Immediately after the commencement of the New Jersey Action, Bergstein spoke with Parmar by telephone and strenuously insisted that Parmar dismiss the New Jersey Action and represented and warranted that the Grange/Parmar Servers were "mistakenly" removed and would be returned, but only after the New Jersey Action was dismissed.

107. From May through September, Bergstein repeatedly stated to Parmar that the only way for a settlement that would include return of the Grange/Parmar Servers and repayment of the loans that Parmar had made to Bergstein's companies would be for Parmar to dismiss the New Jersey Action and only after the dismissal would Bergstein enter into settlement discussions with Parmar.

108. From May through September, Bergstein and Parmar spoke on the phone about the New Jersey Action and Bergstein continuously insisted that he would not discuss settlement without the New Jersey Action being dismissed, and noted that he would otherwise aggressively respond to the complaint filed in the New Jersey Action.

109. On June 28, 2012, Bergstein wrote to Parmar stating that: "You can resolve this if you want. So do so if you mean it. All that will occur in the meantime are responses to your advances."

110. In September, 2012, after Parmar still had not dismissed the case, Bergstein called Parmar and threatened Parmar stating that "I will not be the first one to pay a

harsh penalty for this confusion" which Parmar understood to mean that he would pay a harsh penalty for not dismissing the New Jersey Action.

111.    Believing that he had no other alternative and feeling threatened by Bergstein, Parmar relied on Bergstein's representation as to settlement discussions and directed his attorneys to file a notice withdrawing the New Jersey Action without prejudice.

112.    A withdrawal notice, dated September 27, 2012, was filed in the New Jersey Action.

113.    Bergstein and Pineboard then not only failed to return the stolen Grange/Parmar Servers but also promptly filed a motion for an award of sanctions against Grange, MDT and Parmar in the New Jersey Action. In short, with the help of Alex Weingarten and his firm, Bergstein reneged on the oral promises to pursue settlement and sandbagged Parmar with the sanctions motion.

114.    The "Defendants' Notice of Motion for Sanctions Arising Out of Frivolous Litigation", dated October 17, 2012 ("Sanctions Motion"), was supported by a certification of defendant Alex M. Weingarten, Esq. ("Weingarten"), dated October 15, 2012, ("Weingarten Certification").

115.    Weingarten falsely certified that: "On September 27, 2012, Plaintiffs dismissed this action, without prior notice or any communication of such intent."

116.    The New Jersey Action had only been pending since May 30, 2012, but the Weingarten Certification claimed that the defendants in the New Jersey Action had incurred attorneys' fees through September 30, 2012 in the amount of $125,467.00.

117.    Weingarten later filed a supplemental certification, dated November 12, 2012, in the New Jersey Action certifying that:

"From October 1, 2012 through October 31, 2012, additional
Weingarten Brown fees and costs in the amount of $26,035.13
were incurred by Defendants in connection with this matter.  In the
month of October 2012, Weingarten Brown attorneys and staff
members billed approximately 73 hours in relation to Plaintiffs'
frivolous claims."

118.    Pineboard, together with the other defendants in the New Jersey Action,
was seeking an award of attorneys' fees against a company that it had purchased, and whose
assets it had taken possession of, but as to which Pineboard had failed to pay the full purchase
price.  Pineboard was also seeking an award of attorneys' fees against Grange, a company with
which it had no involvement whatsoever, other than the fact that Pineboard had utilized the
purported MDT purchase to steal all of the Grange/Parmar Servers.

119.    The Judgment is currently subject to an appeal filed by Parmar in the
Appellate Division of the Superior Court of New Jersey.

120.    In part, the instant action pleads claims that initially were asserted in the
New Jersey Action but were dismissed without prejudice: (a) in reliance upon Bergstein's
repeated promises to return the Grange/Parmar Servers; (b) in reliance upon Bergstein's repeated
promises to resolve all issues concerning the repayment of loans previously made by Parmar to
companies controlled by Bergstein; (c) as a result of Bergstein's threats to vigorously oppose the
New Jersey Action if it was not voluntarily dismissed; and (d) as a result of the fact, well known
to Bergstein, that Parmar was then in dire financial straits with no alternative but to succumb to
any demands made by Bergstein and that a judgment for costs and/or fees in any significant
amount would continue to inflict the kind of duress on Parmar which Bergstein specialized in
exploiting.

## FIRST CAUSE OF ACTION
### Fraud In The Inducement – Compensatory Damages
### By Plaintiff Parmar Against Defendant Bergstein

121.   Plaintiff Parmar repeats and re-alleges each and every allegation contained in Paragraphs 1 through 120 above as if more fully set forth at length herein.

122.   Bergstein misrepresented material facts with respect to repayment of each of the loans made by Parmar, including but not limited to the loans listed above.

123.   Bergstein knew of and/or believed in the falsity of each of the foregoing misrepresented facts at the time the facts were misrepresented.

124.   Bergstein intended that Parmar would rely upon each of the foregoing misrepresented facts.

125.   Parmar reasonably relied upon each of the foregoing misrepresented facts.

126.   By reason of the foregoing acts and practices, Plaintiff Parmar has suffered damages in an amount to be determined at trial but which is not less than $85 million.

## SECOND CAUSE OF ACTION
### Fraud In The Inducement – Punitive Damages
### By Plaintiff Parmar Against Defendant Bergstein

127.   Plaintiff Parmar repeats and re-alleges each and every allegation contained in Paragraphs 1 through 126 above as if more fully set forth at length herein.

128.   By means of the foregoing acts and practices, Bergstein committed intentional wrongdoing constituting evil-minded acts with a wanton and willful disregard for the rights of Parmar.

129.   By reason of the foregoing acts and practices, Plaintiff Parmar is entitled to an award of punitive damages against Defendant Bergstein in an amount to be determined at trial, but which is not less than $100 million.

### THIRD CAUSE OF ACTION
**Aiding & Abetting Fraud**
**By Plaintiff Parmar Against Defendants Weingarten and the Weingarten Law Firm**

130.    Plaintiff Parmar repeats and re-alleges each and every allegation contained in Paragraphs 1 through 129 above as if more fully set forth at length herein.

131.    A letter, dated February 16, 2012, and signed by Defendant Weingarten and on the letterhead of the Defendant Weingarten Law Firm, stated to be representing Weston, Pineboard and affiliated entities ("Weingarten Clients"), was sent to Jeffrey W. Lorell, Esq., an attorney at Saiber LLC ("Saiber Law Firm"), a New Jersey law firm then representing Parmar ("Weingarten 2/16/12 Letter").  The Weingarten 2/16/12 Letter bore the "re" notation: "Paul Parmar/Pegasus Blue Star and Pineboard."

132.    The Weingarten 2/16/12 Letter referenced "certain Agreements" pursuant to which "Parmar, or his entities" had sold "certain assets" to the Weingarten Clients.

133.    The Weingarten 2/16/12 Letter stated that a $2.2 million payment ("$2.2 Million Payment") had been sent by wire to the Saiber Law Firm and made assertions including, but not limited to the following:

> "When the funds were wired to your trust account, it was with the understanding that they would be held until you had received further instructions from my Clients authorizing their release.  To date, you have not received any instructions from my Clients authorizing the release of those funds. ... To the extent that you still hold the funds sent to you, which you should, we write remind [sic] you of your obligation to continue to dos so unless and until you receive further instructions from my Clients."

134.    The Weingarten 2/16/12 Letter acknowledged that there were disputes between his clients and Parmar, and claimed that Parmar "has tortuously [sic] interfered with our ability to control the remaining asset."

135.   At the time that the Weingarten 2/16/12 Letter was prepared and sent, Weingarten and the Weingarten Firm were perfectly aware of the fact that Parmar was desperately in need of the $2.2 Million Payment to meet other obligations.

136.   If the $2.2 Million Payment was not received, Parmar would lose by mortgage foreclosure his New Jersey estate that he had constructed at a cost of over $55 million.

137.   The Weingarten 2/16/12 Letter noted that the $2.2 million Payment was made by Swartz IP Services.

138.   Parmar had never had any dealings with Schwartz IP Services.

139.   The Weingarten 2/16/12 Letter was sent to preclude any release of the $2.2 million Payment unless and until Parmar succumbed to a soon to be made demand by Bergstein that Parmar sign releases relinquishing any claim against Bergstein or any of his entities.

140.   The Saiber Law Firm responded to Weingarten in a letter, dated February 21, 2012, which disavowed any knowledge of the dealings between the Weingarten Clients and either Parmar or Schwartz IP Services and stated that "the funds we are holding are likely to be disbursed this coming Friday, February 24, 2012." The Saiber Law Firm suggested that Weingarten's clients apply for a temporary restraint, properly bonded, if they had any claim to the funds.

141.   Weingarten responded in a letter, dated February 22, 2012 ("Weingarten 2/22/12 Letter"), in which Weingarten claimed that: "The fact that a third party with whom we have no business with (Sage) claims that they sent the funds in question is immaterial, all you have to do is follow the actual money trial."

142.    The Weingarten 2/22/12 Letter then issued the following threat: "In any event, you are on notice of our clients' position regarding the use of the funds that they deposited into your trust account and our position regarding your potential liability for releasing those funds without further instructions.  As noted above, guide yourself accordingly."

143.    The Saiber Law Firm responded in a letter, dated February 23, 2012, by continuing to disavow any knowledge as to how Swartz IP Services could have any further interest in the funds deposited into the Saiber Law Firm escrow account, cited statutes and case law to support that position, and noted that Weingarten had failed to provide any documents supporting any such claim.

144.    Privately, however, the Saiber Law Firm was advising Parmar that the funds would not be disbursed unless and until any issue raised by Weingarten was resolved.

145.    At that point, Parmar had absolutely no choice but to concede to whatever demand Bergstein made.

146.    By means of the foregoing acts and practices, Weingarten and the Weingarten Law Firm aided and abetted fraud perpetrated against Parmar.

147.    By reason of the foregoing acts and practices, Parmar has suffered damages in an amount to be determined at trial, but which is not less than $85 million.

## FOURTH CAUSE OF ACTION
### Economic Duress
### By Plaintiff Parmar Against Defendant Bergstein

148.    Plaintiff Parmar repeats and re-alleges each and every allegation contained in Paragraphs 1 through 147 above as if more fully set forth at length herein.

149.    By means of the foregoing acts and practices, at times when Parmar was in dire financial straits, Bergstein engaged in wrongful and unlawful acts and threats constituting

coercion which caused economic duress that deprived Parmar of his unfettered free will and caused Parmar to release enormous amounts of money due to him for nothing, and to release a collection of fine watches to Bergstein for sale with Parmar to receive the sale proceeds but Parmar never received any proceeds and never received return of the watches.

150.    By reason of the foregoing acts and practices, Plaintiff Parmar is entitled to an award of compensatory damages against Defendant Bergstein in an amount to be determined at trial, but which is not less than $85 million.

### FIFTH CAUSE OF ACTION
**Aiding and Abetting Economic Duress**
**By Plaintiff Parmar Against Defendants Silverman, A. Hallac, J. Hallac & Twersky**

151.    Plaintiff Parmar repeats and re-alleges each and every allegation contained in Paragraphs 1 through 150 above as if more fully set forth at length herein.

152.    By means of the foregoing acts and practices, Defendants Silverman, A. Hallac, J. Hallac and Twersky, knowing that conduct by Defendant Bergstein directed against Plaintiff Parmar constituted a breach of duty, gave substantial assistance or encouragement to Defendant Bergstein in so conducting himself.

153.    By reason of the foregoing acts and practices, Plaintiff Parmar is entitled to an award of compensatory damages against Defendants Silverman, A. Hallac, J. Hallac and Twersky in an amount to be determined at trial, but which is not less than $85 million.

### SIXTH CAUSE OF ACTION
**Misappropriation of Trade Secrets – Compensatory Damages**
**N.J. Stat. § 56:15-2 et seq.**
**By All Plaintiffs Against All Defendants**

154.    Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 153 above as if more fully set forth at length herein.

155.    By reason of the foregoing acts and practices, the Defendants have engaged in the misappropriation of business data compilations, programs, methods, techniques, plans and procedures for medical data and information, that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and has been the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

156.    By reason of the foregoing acts and practices, Plaintiffs have suffered damages in the form of actual loss caused by misappropriation and unjust enrichment caused by the misappropriation.

157.    By reason of the foregoing acts and practices, Plaintiffs have suffered damages in an amount to be determined at trial but which is not less than $150 million.

### SEVENTH CAUSE OF ACTION
**Misappropriation of Trade Secrets – Punitive Damages**
**N.J. Stat. § 56:15-4(b)**
**By All Plaintiffs Against All Defendants**

158.    Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 157 above as if more fully set forth at length herein.

159.    By means of the foregoing acts and practices, Defendants engaged in willful and malicious misappropriation.

160.    By reason of the foregoing acts and practices, Plaintiffs are entitled to an award of punitive damages in an amount twice the amount of the compensatory damages awarded.

**EIGHTH CAUSE OF ACTION**
**Misappropriation of Trade Secrets – Attorneys' Fees & Costs**
**N.J. Stat. § 56:15-6**
**By All Plaintiffs Against All Defendants**

161.    Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 160 above as if more fully set forth at length herein.

162.    By means of the foregoing acts and practices, Defendants engaged in willful and malicious misappropriation by stealing the Grange/Parmar Servers to which they had no legal right whatsoever.

163.    By reason of the foregoing acts and practices, Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs incurred in connection with respect to this action.

**NINTH CAUSE OF ACTION**
**Misappropriation of Trade Secrets – Preservation of Secrecy**
**N.J. Stat. § 56:15-6**
**By All Plaintiffs Against All Defendants**

164.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 163 above as if more fully set forth at length herein.

165.    By reason of the foregoing acts and practices, it is necessary and appropriate for this Court to impose reasonable means by which the secrecy of the data contained in the misappropriated Grange/Parmar Servers is preserved.

**TENTH CAUSE OF ACTION**
**Tortious Interference With Contract**
**By Plaintiff Grange Against Defendants Bergstein, Silverman & Twersky**

166.    Plaintiff Grange repeats and re-alleges each and every allegation contained in paragraphs 1 through 165 above as if more fully set forth at length herein.

167.   By means of the foregoing acts and practices, Defendants Silverman and Twersky, acting at the direction of Defendant Bergstein, intentionally and improperly interfered with the performance by Gangar of her employment contract with GHT by inducing or otherwise causing Gangar not to perform the contract and act in contravention of that contract.

168.   By reason of the foregoing acts and practices, Grange has suffered pecuniary loss from the failure of Gangar to perform her employment contract and her actions in contravention of that contract.

169.   By reason of the foregoing acts and practices, Plaintiff Grange has suffered pecuniary loss in an amount to be determined at trial, but which is not less than $5 million.

**WHEREFORE**, Plaintiffs Grange Consulting Group and Parmjit Singh Parmar, demand judgment as follows:

(a)  on the First Cause of Action, awarding damages against Defendant David Bergstein and in favor of Plaintiff Paul Parmar in an amount to be determined at trial, but which is not less than $85 million;

(b)  on the Second Cause of Action, awarding punitive damages against Defendant David Bergstein and in favor of Plaintiff Paul Parmar in an amount to be determined at trial, but which is not less than $100 milion;

(c)  on the Third Cause of Action, awarding damages against Defendants Weingarten and the Weingarten Law Firm and in favor of Plaintiff Paul Parmar in an amount to be determined at trial but which is not less than $85 million;

(d)  on the Fourth Cause of Action, awarding damages against Defendant David Bergstein and in favor of Plaintiff Paul Parmar in an amount to be determined at trial, but which is not less than $85 million;

(e)  on the Fifth Cause of Action, awarding damages against Defendants Robert B. Silverman, Albert Hallac, Jeffrey Hallac and Lawrence Twersky and in favor of Plaintiff Paul Parmar in an amount to be determined at trial, but which is not less than $85 million;

(f)  on the Sixth Cause of Action, awarding damages against all Defendants and in favor of both Plaintiffs in an amount to be determined at trial, but which is not less than $150 million;

(g)  on the Seventh Cause of Action, awarding damages against all Defendants and in favor of both Plaintiffs in an amount to be determined at trial, but which is not less than twice the amount of the compensatory damages awarded pursuant to the Sixth Cause of Action;

(h)  on the Eighth Cause of Action, awarding against all Defendants and in favor of both Plaintiffs the reasonable attorneys' fees and costs incurred by Plaintiffs in connection with this action;

(i)  on the Ninth Cause of Action, imposing reasonable means necessary to preserve the secrecy of the data contained in the misappropriated Grange/Parmar Servers;

(j)  on the Tenth Cause of Action, awarding against Defendants David Bergstein, Robert B. Silverman, Robert B. Silverman and Lawrence Twersky and in favor of Plaintiff Grange damages in an amount to be determined at trial, but which is not less than $5 million.

(k)  granting such other and further relief against all Defendants and in favor of both Plaintiffs as this Court deems just and proper.

## <u>JURY DEMAND</u>

Please take notice that demand is hereby made for trial by jury on all issues that are triable.

Dated: November 6, 2013

**ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.**

By:_____

**875 Third Avenue
New York, New York 10022-0123
(212) 603-6300
Attorneys for Plaintiffs**

## VERIFICATION

**PARMJIT SINGH PARMAR**, being duly sworn, does hereby state as follows:

1.     I am an individual Plaintiff herein and am the manager of Plaintiff Grange Consulting Group, and as such am fully familiar with the facts and circumstances of this Complaint.

2.     I have read the Verified Complaint and I verify that to the best of my knowledge, all the facts alleged herein are true.

3.     I hereby certify that the foregoing statements made by me are true. I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

_____
PAUL PARMAR

Sworn to this _6_ th day of November, 2013

_____
ATTORNEY AT LAW
STATE OF NEW JERSEY

38